# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERINEO SERRANO, | ) 1:09-cv-00982 AWI JMD (HC) |
| Petitioner, | ) FINDINGS AND RECOMMENDATIONS |
| | ) REGARDING PETITION FOR WRIT OF |
| v. | ) HABEAS CORPUS |
| | ) |
| PAT L. VAZQUEZ, Warden, | ) OBJECTIONS DUE WITHIN THIRTY (30) |
| | ) DAYS |
| Respondent. | ) |

Herineo Serrano (hereinafter "Petitioner") is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### PROCEDURAL HISTORY

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a 1984 conviction for two counts of second-degree murder with an enhancement for use of a deadly weapon. The trial court sentenced Petitioner to a term of thirty-two years to life in prison.

Petitioner is not challenging his conviction in this action.  Rather, Petitioner challenges the denial of his parole by the California Board of Parole Hearings (the "Board").  Petitioner contends that the Board's denial of parole violated his constitutional rights.

Petitioner filed a petition for writ of habeas corpus with the Fresno County Superior Court challenging the Board's decision.  The court denied the petition in a reasoned decision on December 2, 2008.

Petitioner also filed petitions for writ of habeas corpus with the California Court of Appeal

1    and California Supreme Court.  Both courts summarily denied the petitions.

2        Petitioner filed the instant petition for writ of habeas corpus on June 4, 2009.  Respondent

3    filed an answer to the petition on September 21, 2009.  On August 8, 2010, Petitioner filed a

4    "Motion for Relief from Default" and an "Amended Traverse."

5                                    **FACTUAL BACKGROUND**

6    **I.      The Commitment Offense**[1]

7        On March 3, 1984, at approximately 3:15 a.m., Petitioner, age seventeen, and co-defendants,

8    Estevan Arreola and Jorge Negrete, went to the home of Alejandro Hernandez in Selma, California.

9    All three men had been drinking before arriving at Hernandez's residence.  The purpose of the visit

10   was to collet money that Hernandez owed Negrete for heroin and a pistol.  Negrete was armed with a

11   forty-five caliber handgun and Petitioner and Arreola were armed with rifles.  An argument ensued

12   between Negrete and Hernandez at which point Petitioner and Arreola went back outside.  The

13   argument escalated and Negrete shot Hernandez twice and Hernandez shot Negrete once.  Negrete

14   went outside, bleeding.  Petitioner and Arreola followed Negrete back inside the house and fired

15   their rifles repeatedly into the living room where ten people were sleeping.  The rifle shots killed two

16   people and wounded four others, leaving one paralyzed.

17       Petitioner testified that he went back inside the house because Negrete would kill him if he

18   did not join in the fight.  Petitioner further testified that he fired into the floor of the living room for

19   the sole purpose of being able to prove that he had fired the gun if Negret checked it later.  Petitioner

20   explained that he did not realize that ten people were sleeping in the living room when he fired

21   because it was dark and he was drunk and scared.

22   **II.     Pre-Conviction Facts**[2]

23       Petitioner has no prior criminal record.

24       Petitioner began drinking beer and other types of alcohol at the age of twelve.  He also used

25

26       [1] The facts of the commitment offense are derived from the Probation Report prepared on November 5, 1984.
     (Resp't's Answer Ex. C, Probation Report, 45-55, Nov. 5, 1984, ECF No. 12.)
27
         [2] The pre-conviction facts are derived from the transcript of Petitioner's May 27, 2008, hearing.  (Answer Ex. A, Pts
28   1-2, Board of Parole Hearings transcript (hereinafter Tr.), 12-18, 33, May 27, 2008.)

1  cocaine periodically.

2         Petitioner had been running money and heroin for Negrette for about six months prior to the

3  commitment offense.

4         Petitioner was born in Michoacan, Mexico.  He has two brothers and three sisters from his

5  parents' marriage and another brother and sister from his mother's second marriage.  Petitioner's

6  father hit him, his siblings, and his mother.  When his mother and father separated, the six children

7  were divided amongst the aunts because Petitioner's parents could not take care of them.

8  **III.    Post-Conviction Facts**[3]

9         Petitioner has had five 115s (serious disciplinary actions), the most recent of which was

10 issued in 1998 for disobeying a direct order.  Petitioner has eight 128 Administrative Rules

11 Violations, the last of which was issued in 1999 for possession of contraband.  Petitioner has

12 remained discipline free since his initial parole hearing on June 1, 2004.

13        Petitioner has been attending Alcoholics Anonymous (AA) since 2000.  He also completed

14 twelve hours of Anger Management training in 2004.

15        Petitioner works in the laundry as a clerk.  He received certificates for Certified Linen

16 Technician, Certified Washroom Technician, and proficiency as a forklift operator.  Petitioner also

17 volunteered for the Child/Family Mural Project.

18 **IV.    Post-Commitment Plans**[4]

19        There is an immigration hold on Petitioner and he will be deported to Mexico upon release.

20 Petitioner plans to work on his uncle's farm in Mexico.  Petitioner testified that his uncle offered to

21 make him a full partner in the farm.  Petitioner produced a letter of support to this effect dated

22 January 23, 2008; however, the letter was not signed and the Board could not take it into

23 consideration.

24        Petitioner also has general letters of support from his three sisters, his brother, and his cousin.

25

26

27        [3](Tr. 24-28.)

28        [4](Tr. 19-23.)

U.S. District Court
E. D. California                                          3

1  **V.     Psychological Evaluation**[5]

2      The Independent Evaluator used two twenty-question instruments to evaluate Petitioner's

3  potential for violence if released into the free community.  The PCL-R gives a measure of

4  psychopathy, which is a strong predictor of future violence.  The HCR-20 attempts to measure risk

5  for future violence by dividing the risk into categories of historical, clinical, and future risk

6  management.  Each instrument placed Petitioner in the "moderate" range for psychopathy and

7  likelihood of future violence.  The Evaluator noted that Petitioner did not mention AA or NA when

8  discussing his parole plans.  Petitioner's risk of future violence is increased by the lack of feasability

9  of his parole plans, his exposure to destabilizers and stress outside of prison, and his lack of support.

10  The Evaluator assessed that overall, Petitioner presents a moderate likelihood of becoming involved

11  in a violent offense if released.

12  **VI     The Board's Decision**[6]

13      The Board found that Petitioner would pose an unreasonable risk of danger to society if

14  released from prison for several reasons.  First, the Board found the nature of the commitment

15  offense was "heinous and atrocious or cruel."  Second, the Board found Petitioner had an unstable

16  social history because he started drinking at twelve, lived in a home with an abusive father, lived

17  with several different relatives during childhood, and was involved in selling heroin as a juvenile.

18  Third, while the Board commended Petitioner on his attendance of AA, it found that he was "not

19  vested in the program as of yet based on his substance abuse discussion."  Fourth, the Board

20  questioned Petitioner's mental state based on the psychological report's overall rating of "moderate,"

21  and because he "continues to somewhat minimize his responsibility for this crime and blames others,

22  family and friends for his actions."  Lastly, the Board found Petitioner's parole plans to be tenuous.

23      The Board recommended that Petitioner "develop insight into the triggers that have caused

24  him to be involved in this type of a crime and further develop an understanding of the minimization

25  of this crime."  The Board further recommended that Petitioner remain discipline free, continue with

26

27      [5](Answer, Ex. A, Pt. 2, Psychosocial Evaluation, Mar. 7, 2008.)

28      [6](Tr. 56-62.)

1  AA, continue to upgrade vocationally, continue to seek self-help, and obtain a signed letter of

2  support and offer of employment from his uncle.  The Board denied parole for three years.

3                                   **DISCUSSION**

4  **I.       Jurisdiction**

5          A person in custody pursuant to the judgment of a State court may petition a district court for

6  relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or

7  treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529

8  U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by

9  the United States Constitution and he is currently incarcerated at Wasco State Prison, which is

10  located in Kern County.  As Kern County falls within this judicial district, 28 U.S.C. § 84(b), the

11  Court has jurisdiction over Petitioner's application for writ of habeas corpus.  See 28 U.S.C. §

12  2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district

13  court where the petitioner is currently in custody or the district court in which a State court convicted

14  and sentenced Petitioner if the State "contains two or more Federal judicial districts").

15  **II.      ADEPA Standard of Review**

16          On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

17  1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

18  enactment.  Lindh v. Murphy, 521 U.S. 320, 326-327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499

19  (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *overruled on other*

20  *grounds by* Lindh, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's

21  enactment)).  The instant petition was filed in 2009 and is consequently governed by the provisions

22  of the AEDPA.  See Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Thus, the petition "may be

23  granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to,

24  or involved an unreasonable application of, clearly established Federal law, as determined by the

25  Supreme Court of the United States.'"  Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28

26  U.S.C. § 2254(d)(1))*, overruled in part on other grounds*, Hayward v. Marshall, 603 F.3d 546, 555

27  (9th Cir. 2010) (en banc); see Lockyer, 538 U.S. at 70-71.

28          Title 28 of the United States Code, section 2254 remains the exclusive vehicle for

1    Petitioner's habeas petition because he is in custody of the California Department of Corrections and

2    Rehabilitation pursuant to a state court judgment.  See Sass v. California Board of Prison Terms, 461

3    F.3d 1123, 1126-1127 (9th Cir. 2006) *overruled in part on other grounds*, Hayward, 603 F.3d at 555.

4          As a threshold matter, this Court must "first decide what constitutes 'clearly established

5    Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71

6    (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

7    Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of

8    the time of the relevant state-court decision."  Id. (quoting Williams, 592 U.S. at 412).  "In other

9    words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

10   principles set forth by the Supreme Court at the time the state court renders its decision."  Id.

11         Finally, this Court must consider whether the state court's decision was "contrary to, or

12   involved an unreasonable application of, clearly established Federal law."  Lockyer, 538 U.S. at 72,

13   (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant

14   the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

15   question of law or if the state court decides a case differently than [the] Court has on a set of

16   materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

17   "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state

18   court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

19   applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "[A] federal

20   court may not issue the writ simply because the court concludes in its independent judgment that the

21   relevant state court decision applied clearly established federal law erroneously or incorrectly.

22   Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the

23   "unreasonable application" inquiry should ask whether the state court's application of clearly

24   established federal law was "objectively unreasonable."  Id. at 409.

25         Petitioner bears the burden of establishing that the state court's decision is contrary to, or

26   involved an unreasonable application of, United States Supreme Court precedent.  Baylor v. Estelle,

27   94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

28   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

1   decision is objectively unreasonable.  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While

2   *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents

3   need be reasonably applied, we may look for guidance to circuit precedents"); Duhaime v.

4   Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can

5   no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit

6   precedent on a federal Constitutional issue . . . This does not mean that Ninth Circuit caselaw is

7   never relevant to a habeas case after AEDPA. Our cases may be persuasive authority for purposes of

8   determining whether a particular state court decision is an 'unreasonable application' of Supreme

9   Court law, and also may help us determine what law is 'clearly established'").  Furthermore, the

10  AEDPA requires that the Court give considerable deference to state court decisions.  The state

11  court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1).  A federal habeas court is

12  bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.

13  2002).

14  **III.      Review of Petitioner's Claims**

15          Petitioner claims that the Board's denial of parole violated his Fifth and Fourteenth

16  Amendment right to due process and equal protection.

17  Due Process

18          *Legal Standard*

19          The Court analyzes a due process claim in two steps.  '[T]he first asks whether there exists a

20  liberty or property interest which has been interfered with by the State; the second examines whether

21  the procedures attendant upon that deprivation were constitutionally sufficient.'" Sass, 461 F.3d at

22  1127. The United States Constitution does not, by itself, create a protected liberty interest in a parole

23  date. Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).

24          Respondent argues that Petitioner does not have a federally protected liberty interest in

25  parole.  The Ninth Circuit Court of Appeals has recognized that "[i]f there is any right to be released

26  on parole, or to release in the absence of some evidence of future dangerousness, it has to arise from

27  substantive state law creating a right to release." Hayward, 603 F.3d at 555.  The Ninth Circuit

28  further recognized that "[t]here is no general federal constitutional 'some evidence' requirement for

1    denial of parole, in the absence of state law creating an enforceable right to parole." Id. at 559.  The

2    Hayward court's finding that there exists no free standing federal due process right to parole, or the

3    right to some evidence of current dangerousness, contained the consistent and continual caveat that

4    state law may in fact give rise to federal protection for those rights.  As later noted by the Ninth

5    Circuit, "state-created rights may give rise to liberty interests that may be enforced as a matter of

6    federal law." Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) (citing Wilkinson v. Austin, 545

7    U.S. 209, 221 (2005)).   The Pearson court found that, "Hayward necessarily held that compliance

8    with state requirement is mandated by federal law, specifically the Due Process Clause" as "[t]he

9    principle that state law gives rise to liberty interests that may be enforced as a matter of federal law is

10   long-established. Id.

11        As noted by the Ninth Circuit in Hayward, the logical next question is whether California's

12   parole scheme gives rise to a liberty interest that can be enforced as a matter of federal law.  The

13   Ninth Circuit has definitively concluded that "California has created a parole system that

14   independently requires the enforcement of certain procedural and substantive rights, including the

15   right to parole absent 'some evidence' of current dangerousness." Pearson, 606 F.3d at 611 (citing

16   Hayward, 603 F.3d at 562); see also Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) (noting that

17   "California's 'some evidence' requirement is a component of the liberty interest created by the

18   parole system of that state").

19        Consequently, the inquiry that a federal habeas court must undertake in determining whether

20   the denial of parole comports with the requirement of federal due process is "whether the California

21   judicial decision approving the governor's [or parole board's] decision rejecting parole was an

22   'unreasonable application' of the California 'some evidence' requirement, or was 'based on an

23   unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 563 (quoting

24   28 U.S.C. § 2254(d)(1)-(2)) (footnotes omitted).  As the Ninth Circuit recently observed in Cooke:

25        Under California law, "the paramount consideration for both the Board and the
         Governor" must be "whether the inmate currently poses a threat to public safety and
26        thus may not be released on parole,"[citation], and "the facts relied upon by the Board
         or the Governor [must] support the ultimate decision that the inmate remains a threat
27        to public safety.

28   Cooke, 606 F.3d at 1214 (quoting In re Lawrence, 44 Cal.4th 1181, 1210, 1213 (2008)); see also Cal.

Code Regs. tit. 15, § 2402(a) ("[I]f in the judgment of the panel the prisoner will pose an

unreasonable risk of danger to society if released from prison," the prisoner must be found unsuitable

and denied parole).  The California Supreme Court in Lawrence held that, "[t]he relevant

determination for the Board and the Governor is, and always has been, an individualized assessment

of the continuing danger and risk to public safety posed by the inmate."  Id. at 1227 (noting that

"mere recitation of the circumstances of the commitment offense, absent articulation of a rational

nexus between those facts and current dangerousness, fails to provide the required "modicum of

evidence" of unsuitability").  Thus, the dispositive inquiry now before this Court is "'whether the

identified facts are *probative* to the central issue of *current* dangerousness when considered in light

of the full record before the Board or the Governor.'"  Cooke, 606 F.3d at 1214 (quoting In re

Lawrence, 44 Cal.4th at 1221) (emphasis in original).

The initial step in applying AEDPA's standards is to "identify the state court decision that is

appropriate for our review."  Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more

than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last

reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) for the presumption

that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same

ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained

state court decisions to the last reasoned decision to determine whether that decision was contrary to

or an unreasonable application of clearly established federal law.  Bailey v. Rae, 339 F.3d 1107,

1112-1113 (9th Cir. 2003).  Here, the Fresno County Superior Court, the California Court of Appeal,

and the California Supreme Court all adjudicated Petitioner's claims.  As the California Court of

Appeal and California Supreme Court issued summary denials of Petitioner's claims, the Court

"look[s] through" those courts' decisions to the last reasoned decision; namely, that of the Fresno

County Superior Court.  See Ylst v. Nunnemaker, 501 U.S. at 804.

*Discussion*

The Court finds that the superior court's decision affirming the Board's decision is not an

unreasonable application of the California "some evidence" standard.  As the Ninth Circuit noted,

"courts in this circuit . . . need only decide whether the California judicial decision approving the

1  governor's [or Board's] decision rejecting parole was an 'unreasonable application' of the California

2  'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of

3  the evidence.'" Hayward, 603 F.3d at 562-63.

4       The superior court found that there is at least some evidence "that Petitioner still poses an

5  unreasonable danger to society and requires further therapy."  In reaching this conclusion, the court

6  relied on (1) the violent nature of the commitment offense; (2) Petitioner's record of multiple

7  disciplinary infractions; (3) Petitioner's continued minimization of his responsibility for the

8  commitment offense; and (4) the psychological report's classification of Petitioner as a moderate risk

9  of violence in a free community.  (Answer Ex. B.)

10       Immutable factors such as the commitment offense or a petitioner's criminal history can only

11  be the basis for denial of parole if those facts "support the ultimate conclusion that inmate *continues*

12  to pose an unreasonable risk to public safety."  In re Lawrence, 44 Cal. 4th at 1221 (emphasis in

13  original).  Here, the Court finds no evidence that the commitment offense or Petitioner's past

14  disciplinary infractions support a finding of current dangerousness.  However, the Court agrees with

15  the superior court that Petitioner's minimization of his responsibility in the commitment offense and

16  his classification as presenting a moderate risk of danger if released constitute some evidence of

17  current dangerousness.

18       Throughout the hearing, Petitioner continually spoke of the commitment offense as it if were

19  an accident.  Initially, Petitioner claims that he went into Hernandez's house holding a rifle, not to

20  hurt anyone, but to give him confidence and to show off.  (Tr. 10.)  Additionally, Petitioner remains

21  steadfast in his testimony that he thought he was shooting at the floor of an empty room.  He further

22  maintains that he did not see the ten people sleeping in the living room because it was dark and he

23  was drunk and scared.  (Id. at 11.)  The Board found it difficult to believe that Petitioner was

24  completely unaware that the room into which he fired was full of sleeping people, and even more

25  difficult to believe that, with the shooting going on in the other room, all of those people remained

26  quiet and asleep.  (Id. at.63.)  The Court agrees that Petitioner's attitude towards the commitment

27  offense places blame on the circumstances of the situation instead of on himself.  Petitioners's

28  continual minimization of his role in the commitment offense constitutes some evidence of current

1    dangerousness.

2         Additionally, the psychological evaluation provides further evidence of current

3    dangerousness by classifying Petitioner as a "moderate" risk of danger if released into free society.

4         As some evidence exists that Petitioner poses a current risk of danger to society, the superior

5    court's decision upholding the Board's denial of parole is not an unreasonable application of federal

6    law.  Accordingly, Petitioner's claim that his due process rights were violated is meritless.

7    Equal Protection

8         Petitioner claims that by focusing on his Mexican citizenship during the hearing, the Board

9    violated his Fourteenth Amendment Equal Protection rights.

10        Application of the standards set forth in AEDPA are significantly impeded where, as here, the

11   state court supplies no reasoned decision for one of Petitioner's federal claims. Delgado v. Lewis,

12   223 F.3d 976, 981 (9th Cir. 2000). Under such circumstances, the Court independently reviews the

13   record to determine whether the state court clearly erred in its application of Supreme Court law.  Id.

14   at 982 ("Federal habeas review is not de novo when the state court does not supply reasoning for its

15   decision, but an independent review of the record is required to determine whether the state court

16   clearly erred in its application of controlling federal law"); see also Greene v. Lambert, 288 F.3d

17   1081, 1089 (9th Cir. 2002).  Although the Court independently reviews the record, it still defers to

18   the state court's ultimate decision.  Because the superior court did not discuss the equal protection

19   issue, this Court will make an independent review of the record to determine whether Petitioner's

20   constitutional rights were violated.

21        To prove an equal protection claim, the petitioner must show that he was intentionally treated

22   differently from others similarly situated and there was no rational basis for the differing treatment.

23   See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  "[W]here a group possesses

24   'distinguishing characteristics relevant to interests the State has the authority to implement,' a State's

25   decision to act on the basis of those differences does not give rise to a constitutional violation,"

26   Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 367 (2001) (quoting Cleburne

27   v. Cleburne Living Center, Inc., 473 U.S. 432, 441 (1985)), so long as there is a "'rational

28   relationship between the disparity of treatment and some legitimate governmental purpose,'" Id.

1   (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)).  Once such legislation has been enacted,

2   　[T]he Fourteenth Amendment "requires that all persons subject to . . . legislation shall
3   　be treated alike under like circumstances and conditions, both in privileges conferred
    　and in the liabilities imposed." (Citation omitted) When those who appear similarly
4   　situated are nevertheless treated differently, the Equal Protection Clause requires at
    　least a rational reason for the difference, to assure that all persons subject to
5   　legislation or regulation are indeed being "treated alike, under like circumstances and
    　conditions."  Thus, when it appears that an individual is being singled out by the
6   　government, the specter of arbitrary classification is fairly raised, and the Equal
    　Protection Clause requires a "rational basis for the difference in treatment." (Citation
7   　omitted.)

8   Engquist v. Or. Dept. of Agr., 553 U.S. 591, 128 S.Ct. 2146, 2152 (2008).

9   　　　Even when a law is evenhandedly applicable, equal protection also requires that the law be

10  evenhanded as actually applied to the petitioner.  McQueary v. Blodgett, 924 F.2d 829, 835 (9th Cir.

11  1991).

12  　　　In this case, Petitioner alleges that the Board applied California's parole determination laws

13  to him in a disparate manner due to his Mexican citizenship.  This claim is without merit because

14  Petitioner does not allege any facts which make out a prima facie case that an equal protection

15  violation occurred.  First, Petitioner makes no showing that he was treated differently than similarly

16  situated inmates. He points to no evidence that non-Mexican citizens convicted of two counts of

17  second-degree murder would have received parole under the same circumstances.  Second, Petitioner

18  does not explain how his citizenship resulted in denial of parole when neither the Board nor the

19  superior court relied on his citizenship in their respective decisions.  As such, Petitioner's equal

20  protection rights were not violated and the superior court's order upholding the Board's decision to

21  deny parole was not an unreasonable application of federal law.

                                **CONCLUSION**

22  For the foregoing reasons, Petitioner should not be granted habeas relief.

                              **RECOMMENDATION**

23  Accordingly, IT IS HEREBY RECOMMEND that:

24  1.      The petition for writ of habeas corpus be DENIED;

25  2.      All outstanding motions be vacated; and

26  3.      The Clerk of Court be directed to enter judgment for Respondent.

27

28

U.S. District Court
E. D. California
                                      12

1         This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United

2    States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of

3    the Local Rules of Practice for the United States District Court, Eastern District of California.

4    Within thirty (30) days after being served with a copy, any party may file written objections with the

5    court and serve a copy on all parties.  Such a document should be captioned "Objections to

6    Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

7    filed within ten (10) *court* days (plus three days if served by mail) after service of the objections.

8    The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The

9    parties are advised that failure to file objections within the specified time may waive the right to

10   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11

12

13   IT IS SO ORDERED.

14   **Dated:    August 16, 2010**              **/s/ John M. Dixon**
                                                   UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28